**ST. PAUL FIRE & MARINE INSURANCE COMPANY, As Subrogee of E. Gluck Corporation, Plaintiff–Appellee,**

v.

**CITY OF NEW YORK and City University of New York, Defendants–Appellants,**

**and**

**Contel Business Systems, Inc. f/k/a Executone, Inc., Defendant.**

**CONTEL BUSINESS SYSTEMS, INC. f/k/a Executone, Inc., Third–Party Plaintiff,**

v.

**BEDROCK REALTY CO. and Lazard Realty, Inc., Third–Party Defendants.**

**No. 879, Docket 89–7904.**

United States Court of Appeals, Second Circuit.

Argued Jan. 31, 1990.

Decided June 27, 1990.

Barry P. Schwartz, New York City (Fay Leoussis, Peter L. Zimroth, Corp. Counsel of the City of New York, of counsel), for defendants-appellants.

David J. Groth, Philadelphia, Pa. (Cozen and O'Connor, Philadelphia, Pa., Kenneth A. Bloom, O'Donnell, Fox & Gartner, P.C., New York City, of counsel), for plaintiff-appellee.

Before OAKES, Chief Judge, KEARSE and FLETCHER *, Circuit Judges.

OAKES, Chief Judge:

In this appeal of a judgment entered in the United States District Court for the Eastern District of New York (I. Leo Glasser, Judge) on August 10, 1989, the City of New York and City University of New York challenge a jury verdict that they are liable for water damage that ruined a half-million dollar inventory of watches. We agree with appellants' claims that the action should not have been submitted to the jury on a theory of *res ipsa loquitur* and that appellee failed to make out a prima facie case of negligence. Accordingly, we reverse the judgment of the district court.

## BACKGROUND

The dispute centers on the events of June 16, 1986, at 29–10 Thomson Avenue,

* The Honorable Betty B. Fletcher, of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

Long Island City, Queens, when a water leak, described by one eyewitness as "like Niagara Falls," rained down upon an inventory of watches in the sixth-floor premises of E. Gluck Corporation ("Gluck"). The source of the leak was a fully opened one-inch drain valve on a large air-conditioning unit in a machine room on the building's seventh floor ("Room 747"), which was subleased by the City of New York for use as additional classroom space for LaGuardia Community College, part of the City University of New York (referred to jointly as the "City" appellants). The sublessor of the seventh floor was Contel Business Systems, Inc. ("Contel"), the building's former owner, which was contractually responsible for providing air conditioning to the floor as well as maintaining and repairing the air-conditioning unit.

St. Paul Fire & Marine Insurance Company ("St. Paul"), as subrogee of Gluck, brought this diversity action in March 1987, alleging that the City's and Contel's negligence caused the massive water leak. Contel, in turn, brought a third-party action against Bedrock Realty Company and Lazard Realty, Inc., the building's owner and managing agent, which was dismissed when the district court granted the third-party defendants' motion for a directed verdict during the trial.

The following facts were established at trial. No classes were scheduled at LaGuardia Community College on June 16, 1986, so activity on the seventh floor was quieter than usual. The security guard stationed on the floor during the day did not see anyone go near Room 747. A guard working the evening shift, Tom Farley, reported that a Bedrock employee named Kurt was on the seventh floor twice that afternoon, and at 5:15 P.M. was seen walking towards Room 747.

At 8:15 P.M., after making a final round of the floor, Farley locked the seventh floor and left the building. Two-and-a-half hours later, at 10:45 P.M., a maintenance worker cleaning space used by LaGuardia on the building's third floor noticed a "serious" water leak coming from the ceiling. The worker notified a building security guard, who called LaGuardia's chief engineer, Henry Paulsen, at his home around 11 P.M. to tell him about the problem. Paulsen instructed him to put a garbage pail under the leak and said he would investigate it when he reported for work at 6 A.M. the next morning.

Around the same time, an alarm in Gluck's vault area on the sixth floor was activated by the water leak. Two police officers responded to the alarm at 11:20 P.M., but they left when they were unable to gain access to Gluck's locked premises. Sometime between 11:30 P.M. and midnight, Jack Litwack, a Gluck vice president, also arrived at the building. When Litwack unlocked and entered the sixth floor, he saw water seeping out from under Gluck's vault doors. Upon opening the vault doors, he saw water pouring down from the ceiling, causing a flood four to five inches deep on the floor. Believing that the watches, which were drenched and apparently not waterproof, were already ruined and that there was nothing he could do to stop the leak, Litwack went home.

Alerted by a security guard, LaGuardia's maintenance worker, who was on the third floor, unlocked and inspected LaGuardia's space on the seventh floor sometime around 12:30 A.M. He discovered that the leak was coming from an air-conditioning unit in Room 747, which was always left unlocked so that Contel could have access to it. Paulsen, LaGuardia's engineer, was again called at home, and he arrived at the building sometime between 1 and 2 A.M. When he went up to the seventh floor, Paulsen had to wade through water an inch-and-a-half deep to close the drain valve.

A subsequent investigation by LaGuardia as to the cause of the flood was inconclusive.

Following the presentation of evidence at trial, the City and Contel made motions to dismiss the complaint, which were denied. The case against the City then went to the jury on two claims: (1) a *res ipsa loquitur* negligence claim based on the drain valve being open and (2) a standard negligence claim for failing to stop the leak in a timely

manner. The court instructed the jury that the claim against Contel was based on its alleged negligent maintenance or repair of the drain valve.

On March 30, 1989, the jury returned a special verdict that absolved Contel and apparently found the City liable under both negligence theories. We say apparently because, as all parties now acknowledge, the question on the special verdict form that was supposed to address the *res ipsa loquitur* issue was less than clear in its approach. The sole question asked of the jury to establish the City's negligence on the *res ipsa loquitur* claim was whether the City "failed to exercise reasonable care in controlling access to room 747." [1] The jury answered that question in the affirmative, as well as a separate question addressed to the delay claim, namely whether Paulsen "failed to appropriately respond to notice he received that there was a water leak on the third floor." The jury assessed Gluck's damages at $529,262, which, with interest, amounted to $662,375.02 in the court's amended judgment of August 10, 1989.

The City challenges the judgment on two grounds: (1) St. Paul's claim that the City negligently caused the leak should not have been submitted to the jury on a *res ipsa loquitur* theory, and (2) St. Paul failed to make out a prima facie case of negligence in its claim that the City failed to stop the leak in a timely manner.

## DISCUSSION

### Res Ipsa Loquitur Claim for Causing the Leak

■ *Res ipsa loquitur* is an often confused and often misused doctrine that enables a jury presented only with circumstantial evidence to infer negligence simply from the fact that an event happened. Since the time it was crafted by Baron Pollock in *Byrne v. Boadle,* 2 H. & C. 722, 159 Eng.Rep. 299 (1863), in which a now-legendary barrel of flour rolled out of a window, its use has expanded to cover a myriad of accidents and incidents. But before a case can be submitted to a jury in New York on a *res ipsa loquitur* theory, there are three requirements that must be met. The plaintiff must establish that: (1) the event was of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it was caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it was not due to any voluntary action or contribution on the part of the plaintiff. *See Dermatossian v. New York City Transit Auth.,* 67 N.Y.2d 219, 226, 492 N.E.2d 1200, 1204, 501 N.Y.S.2d 784, 788 (1986) (citation omitted); *see generally* Restatement (Second) of Torts § 328D (1965). In the case before us, the City's main challenge is that the second element of the test, namely whether the air-conditioning unit was within its exclusive control, was not met.

■ The purpose of the exclusive control requirement is to eliminate within reason the possibility that the event was caused by someone other than the defendant. *See Dermatossian,* 67 N.Y.2d at 227, 492 N.E.2d at 1205, 501 N.Y.S.2d at 789. Accordingly, in order to establish exclusive control, "the evidence 'must afford a rational basis for concluding that the cause of the accident was probably "such that the defendant would be responsible for any negligence connected with it." ' " *Id.* (quoting 2 F. Harper & F. James, *The Law of Torts* § 19.7 at 1086 (1956) (quoting Prosser, *Res Ipsa Loquitur in California,* 37 Cal.L.Rev. 183, 201 (1949))). Although the possibility of all other causes need not be eliminated altogether, " 'their likelihood must be so reduced that the greater probability lies at defendant's door.' " *Id.* at 227, 492 N.E.2d at 1205, 501 N.Y.S.2d at

1. The record and briefs are muddled as to the different claims of negligence St. Paul made against the City. At oral argument, St. Paul's counsel clarified that evidence concerning the City's alleged failure to secure Room 747 adequately was only related to the exclusive control requirement of *res ipsa loquitur* and was not intended to be asserted as a separate negligence claim. In any event, we do not believe the City acted negligently in leaving Room 747 unlocked, for Contel needed access to the air-conditioning unit and the City had no reason to foresee that the room would attract vandals or outsiders.

789 (quoting 2 F. Harper & F. James, *The Law of Torts* § 19.7 at 1086). In other words, to invoke the doctrine of *res ipsa loquitur*, the plaintiff must establish control by the defendant "of sufficient exclusivity to fairly rule out the chance that [the injury] was caused by some agency other than defendant's negligence." *Id.* at 228, 492 N.E.2d at 1205, 501 N.Y.S.2d at 789.

As numerous cases have shown, it is not enough to prove that the defendant had control if there is sufficient evidence that a third party also had access to the instrumentality that caused the injury. For example, in *De Witt Properties v. City of New York*, 44 N.Y.2d 417, 377 N.E.2d 461, 406 N.Y.S.2d 16 (1978), the court found that although the City controlled the water mains under the street, the plaintiffs were not entitled to a *res ipsa loquitur* instruction because there was proof that Consolidated Edison also had access to the area of a broken water main and the proof did not eliminate the utility's activities as a possible cause of the broken main. The court explained that "proof that third parties have had access to the instrumentality generally destroys the premise, and the owner's negligence cannot be inferred." *Id.* at 426, 377 N.E.2d at 465, 406 N.Y.S.2d at 27.

Two recent cases involving public transportation in New York City similarly establish limits on the availability of *res ipsa loquitur.* In *Ebanks v. New York City Transit Auth.*, 70 N.Y.2d 621, 512 N.E.2d 297, 518 N.Y.S.2d 776 (1987) (mem.), the plaintiff filed suit after being injured when he became caught in a two-inch gap that had opened upon an escalator stair in the subway system. The case was submitted to the jury on a *res ipsa loquitur* theory, and the New York Court of Appeals reversed. The Court of Appeals reasoned that although the Transit Authority owned and maintained the escalator, the proof at trial did not adequately refute the possibility that the escalator had been damaged by a member of the public either inadvertently, such as by permitting a hand truck to get stuck in the escalator, or through an act of vandalism. *See id.* at 623, 512 N.E.2d at 298, 518 N.Y.S.2d at 777. In *Dermatossian, supra*, the Court of Appeals ruled that an action involving an injury allegedly caused by a defective grab handle on a bus should not have been submitted to the jury on a *res ipsa loquitur* charge because the proof did not adequately exclude the possibility that the grab handle was broken by something other than the Transit Authority's negligence, such as a fellow bus passenger. *See Dermatossian*, 67 N.Y.2d at 228, 492 N.E.2d at 1205, 501 N.Y.S.2d at 789.

In the case before us, like *Ebanks* and *Dermatossian*, there was ample evidence that the leak may have been caused by something other than the defendants' negligence. In the first place, the City always left Room 747 unlocked so that it would be accessible to Contel employees to service and repair the air-conditioning units. Accordingly, anyone with access to the seventh floor could have walked right into the room. Although no classes were scheduled on June 16, 1986 and the floor was quieter than usual, the record establishes that many people other than City or Contel employees passed through the floor. Most significantly, there was specific evidence that a particular individual not affiliated with the City or Contel was spotted in the vicinity of Room 747 on two separate occasions that afternoon. The only person LaGuardia's security guards could recall seeing near the air-conditioning room that entire day was an individual named Kurt, who worked for Bedrock Realty Company. According to LaGuardia's incident report, which was admitted into evidence, Kurt approached the security desk on the seventh floor at 5:15 P.M. and told the guard that he was going into the air-conditioning room. The guard saw Kurt walk in the direction of Room 747 and never saw him leave the floor. Because an individual could exit the seventh floor by way of a stairway after the floor was locked for the night, it is possible that Kurt or some other person may have remained on the floor after it was locked at 8:15 P.M. The fact that the only specific evidence of access to the drain valve involved someone other than an employee of the defendants weighs

strongly against the application of *res ipsa loquitur.*

Moreover, the nature of the leak also casts doubt about the involvement of City or Contel employees. Because the air-conditioning unit could only be operated with the drain valve closed and Contel, not the City, maintained and repaired the air conditioners, it is far from likely that a City employee went into Room 747 and negligently opened the drain valve. And because no maintenance work was done on the unit on the day in question, it is also not likely that a Contel employee went in and negligently opened it. This supposition is confirmed by the jury verdict absolving Contel of liability.

In light of all of the evidence presented in this case, we cannot say that the evidence " 'afford[s] a rational basis for concluding that the cause of the accident was probably "such that the defendant would be responsible for any negligence connected with it." ' " *Dermatossian,* 67 N.Y.2d at 227, 492 N.E.2d at 1205, 501 N.Y.S.2d at 789. St. Paul's proof did not adequately exclude the possibility that the drain valve was opened by someone other than a City or Contel employee, such as Bedrock employee Kurt or some vandal who had access to the floor during the day. Accordingly, St. Paul failed to establish defendants' exclusive control over Room 747, and submission of this case to the jury on a theory of *res ipsa loquitur* was improper. Because St. Paul offered no direct evidence implicating the City, it also failed to establish a prima facie case on a standard negligence claim against the City for causing the leak.

### Standard Negligence Claim for Delay in Responding

■ As to the jury's finding that the City negligently delayed responding to the report of a leak, the City argues that it had no way of knowing that there was a leak on the seventh floor because the 11 P.M. phone call to Paulsen, LaGuardia's chief engineer, reported a water leak through the ceiling of LaGuardia's space on the third floor. Even assuming that that report constituted notice of a leak on the

seventh floor, the City argues that it should not be liable for damage to Gluck's watches because they had already been destroyed by that time.

At 11 P.M., Paulsen was called at home and told about a "serious" leak on the third floor. Although St. Paul sought to establish that the phone call was sufficient to provide the City with notice of a leak coming from the seventh floor, we find that that proposition requires too great a leap of imagination. Between LaGuardia's space on the third floor and LaGuardia's space on the seventh floor were the fourth, fifth and sixth floors of the building, none of which was occupied by the City. Only a seer, a soothsayer or a clairvoyant would have suspected the problem originated on the seventh floor; alas, Paulsen was just an engineer. We thus find that Paulsen acted reasonably in not calling for an immediate inspection of the seventh floor. Accordingly, the City was not negligent in failing to discover the source of the leak after the initial report.

Even if we found that the 11 P.M. call put the City on notice about a possible leak coming from the seventh floor, the evidence suggests that no additional damage was caused by its failure to turn off the water earlier. By the time Gluck vice president Jack Litwack arrived at the building between 11:30 P.M. and midnight, he saw water "like Niagara Falls" pouring down the shelves lining the vault. Even if Paulsen had headed for the building immediately upon receiving the 11 P.M. call, he could not have gotten there much before Litwack, for he lived some twenty miles away. By that time, it appeared to Litwack at least that the watches were already destroyed. After all, after seeing the condition of the vault he left the building and went home instead of trying to salvage any of the watches.

Thus, as with St. Paul's *res ipsa loquitur* claim, we believe that the district court should not have submitted the negligent delay claim to the jury. St. Paul failed to establish a prima facie case that the City acted negligently by not responding sooner to the report of a leak on the third floor.

Finding no evidence in the record sufficient to enable either of St. Paul's negligence claims against the City to go to a jury, we reverse the district court's judgment.